[Cite as *In re K.M.-B.*, 2015-Ohio-4626.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re K.M.-B., T.M., E.M.

Court of Appeals No. L-15-1037

Trial Court No. JC 14241726

**DECISION AND JUDGMENT**

Decided: November 6, 2015

* * * * *

Dan Nathan, for appellants.

Karin L. Coble, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} Appellants, H.M. and D.M., appeal from the January 23, 2015 judgment of the Lucas County Court of Common Pleas, Juvenile Division, which awarded appellee, C.M., visitation with her grandchildren. For the reasons which follow, we reverse.

FIRST ASSIGNMENT OF ERROR:

THE TRIAL COURT ERRED IN DETERMINING THAT IT HAD JURISDICTION TO AWARD GRANDPARENT VISITATION REGARDING EMILY.

SECOND ASSIGNMENT OF ERROR:

THE TRIAL COURT ERRED IN DETERMINING THAT IT HAD JURISDICTION TO AWARD GRANDPARENT VISITATION REGARDING TYLER.

THIRD ASSIGNMENT OF ERROR:

THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT THE TRIAL COURT'S DECISION THAT AN AWARD OF GRANDPARENT VISITATION IS IN THE CHILDREN'S BEST INTEREST.

FOURTH ASSIGNMENT OF ERROR:

THE TRIAL COURT ERRED BY FAILING TO GIVE THE CONSTITUTIONALLY REQUIRED WEIGHT TO THE PARENTING DECISION OF THE PARENTS.

{¶ 2} C.M., the maternal grandmother of E.M., T.M., and K.M.-B. (hereinafter the "grandmother"), petitioned the court on July 23, 2014, to establish non-parent visitation with her grandchildren pursuant to R.C. 3109.11 or 3109.12. G. is the maternal

grandfather of the children and is divorced from the grandmother. The grandmother is currently married to J.M., whom she refers to as "Papa J."

{¶ 3} H.M. is the mother of all of the children (hereinafter referred to as the "mother"). R.B. is the father of K.M.-B., who was born in 2005. The mother was never married to R.B. D.M. is the father of E.M. and T.M. T.M. was born on December 11, 2007. The mother and D.M. were unmarried, but cohabitated, at the time of T.M.'s birth. They were married approximately four months later on April 16, 2008. E.M. was born on March 2, 2010.

{¶ 4} A hearing was held on November 3, 2014, before a magistrate, and all of the parties appeared pro se. While the parties referred to documents while they testified, none of those documents were admitted into evidence and thus are not part of the record on appeal. Furthermore, no objections were made during the presentation of the evidence. The following evidence was admitted.

{¶ 5} The grandmother testified the mother was a "loving and caring mother." However, the grandmother did not agree with the mother's decision to isolate the grandchildren from the grandmother. The grandmother testified she loved the children and had participated in their lives since their births. She participated in family and school events, as well as spending time alone with the children. She attended water parks and festivals with the family. She would assist appellants when she was available. She would take the children to a campground in the summer for a weekend. She purchased clothing for the grandchildren. She entertained the children on overnight stays.

3.

Furthermore, the grandmother testified that she has always had a close and loving relationship with appellants. The grandmother was a school bus driver since 2002 and had received recognition from parents for her loyalty, patience, and safety. The grandmother testified she had only been issued three traffic citations.

{¶ 6} The grandmother further testified that she lived with appellants for a few months after she separated from her first husband, J.M. On September 12, 2012, D.M. and the grandmother had a verbal argument, which led to a tense environment for a few days. When she returned home from work in the early morning hours of September 16, 2012, the locks had been changed. Both she and the mother called the police. The grandmother testified that the mother told the police that the grandmother had voluntarily moved out on September 14, but the grandmother denied having moved out. The grandmother was instructed to leave the premises immediately. The mother testified the grandmother was ticketed for excessive noise and that the police report indicated the grandmother was exhibiting irrational behavior that night. The grandmother testified that the ticket was dismissed. The mother testified that on April 10, 2013, the grandmother was convicted of criminal damaging. The grandmother testified the conviction was later expunged.

{¶ 7} The grandmother further testified that after the September incident, the relationship between the parties deteriorated. The mother testified that she had told the grandmother specific rules that had to be complied with for the grandchildren to spend time with her, but the grandmother refused to abide by those rules. The mother found

4.

that the only way to reason with the grandmother was to end contact with her. The mother would allow the grandchildren to see the grandmother in public places but never to go to the grandmother's home where J.M. resided because of his criminal convictions for DUI. The grandmother admitted that J.M. had been convicted of four DUI offenses.

{¶ 8} The mother testified the grandmother had filed a small claims case arising out of an incident where her bus had been blocked by trucks and she was forced to back up the bus. The defendant in that case attested the grandmother refused to back up and instead verbally confronted a truck driver over the issue and made offensive gestures. The mother also testified the grandmother had attempted to falsify her paycheck. The mother further testified that before the criminal damaging case, the mother and D.M. filed suit in small claims against the grandmother and won the suit. The grandmother filed a counterclaim that they had taken her property, but it was thrown out because the grandmother did not appear.

{¶ 9} The grandmother testified regarding two other specific events evidencing K.M.-B.'s desire to see her grandmother. In June 2014, the grandmother attended a sporting event for one of the children because a civil protection order against her had expired.[1] The mother's father, the grandmother's ex-husband, G., was also there. While she was there, the grandmother gave K.M.-B. money for concessions. A few days later,

_____

[1] We note that the grandmother stated a civil protection order had expired but later testified that one was imposed after the October 14, 2014 incident. The record is unclear whether there were two civil protection orders issued against the grandmother.

the mother called the grandmother and told her not to attend the games when G. was also attending because G. was upset that he could not afford to give the children money. The grandmother refused to comply with the mother's request and the mother did not call the grandmother again.

{¶ 10} On October 4, 2014, the grandmother attended another sporting event. The grandmother spoke to K.M.-B., who wanted to invite the grandmother to a grandparent breakfast at school. A few minutes afterward, the mother took the kids away. The mother testified she left because the grandmother referred to "Papa J." after the mother had told the grandmother not to refer to J.M. as "Papa" to the children because he was not related to them. The mother did not want to discuss the issues regarding J.M. with the children. After that incident, a civil protection order was issued, and the grandmother was separated from the children for approximately 19 months. While she could see the children, the grandmother could not spend time with them as she had done prior to September 2012.

{¶ 11} K.G., the grandmother's sister and the children's great aunt, testified the mother's children wanted to see and spend time with their grandmother. In June 2014, at the wedding of the great aunt's daughter, the great aunt observed K.M.-B. crying profusely and then D.M. talking to K.M.-B. for a short time. The great aunt approached K.M.-B. to see what was wrong. K.M.-B. told the great aunt K.M.-B was not allowed to see her grandmother. The grandmother also testified that she spoke to K.M.-B. that night and learned that K.M.-B. was unhappy because she could not visit the grandmother. Both

6.

women testified that they were supportive and positive. The mother testified she also spoke to her daughter and explained that she was not allowed to go to her grandmother's house because J.M. is not her "Papa" and K.M.-B. did not need to be around him. The mother felt it was inappropriate to explain the problem to K.M.-B. because she was a child.

{¶ 12} The great aunt also testified that in July 2014, the mother and her children were at a birthday party for the great aunt's daughter when K.M.-B. asked to go to the grandmother's house. The mother said they had to go home and check first. Later at the party when the great aunt and K.M.-B. were alone, K.M.-B. said she wanted to see her grandmother. The great aunt had observed in the past that K.M.-B. enjoys visiting with her grandmother and that K.M.-B. is upset by the current situation.

{¶ 13} Another time, K.M.-B. was visiting the great aunt's granddaughter and K.M.-B. asked the great aunt to take her to her grandmother's house. The great aunt did not want to be put in the middle of the issue and feigned an excuse to avoid the issue. The great aunt could not understand why there was a breakdown in the relationship between the mother and the grandmother because the mother was a good mother and the grandmother was a good grandmother. The great aunt just wanted the entire family to be able to associate again like they had in the past.

{¶ 14} The mother explained that E.M. and T.M. do not communicate with the grandmother because they realize something is wrong and are uncomfortable. The two children were at the house in September 2012 when the grandmother went around the

7.

house banging on the windows. The mother did not want to tell the children very much about what was going on between the mother and their grandmother. She did not want them to visit the grandmother when J.M. was present because he was not their grandpa and he had just committed a fourth DUI offense. The mother also believed the grandmother had acted irrationally at times and refused to abide by the mother's rules. The mother testified that she had found the only way she could deal with the grandmother was to stop trying to talk to her and avoid contact for a time.

{¶ 15} The magistrate concluded it was in the best interests of the children that they have visitation with the grandmother. In a decision dated November 10, 2014, the magistrate awarded the grandmother visitation with the children every other weekend from 10:00 a.m. Saturday through 5:00 p.m. Sunday; the day after Christmas and the day after Thanksgiving, from noon to 10:00 p.m. The magistrate required the grandmother to provide transportation to and from her visits, not to allow J.M. to transport the children, and not allow anyone to be under the influence of drugs or alcohol while the children were present. The trial court adopted the decision on November 13, 2014.

{¶ 16} On November 15, 2014, the grandmother arrived at the home of the grandchildren with a police officer to pick up the kids for her first visitation, but no one was home. She returned on November 16, 2014, and a police officer spoke to someone who refused to send the children with the grandmother. Therefore, the grandmother filed a motion to show cause.

8.

{¶ 17} On November 21, 2014, the mother and D.M., through counsel, filed objections to the magistrate's decision. They argued that the decision is not in the best interest of K.M.-B., is excessive, and did not give deference to the mother's wishes. The mother and D.M. argued that the magistrate lacked jurisdiction to make a visitation award regarding T.M. and E.M.

{¶ 18} In its January 23, 2015 judgment, the juvenile court agreed that it had relied on R.C. 3109.051 instead of R.C. 3109.12(A) for jurisdiction to determine the visitation issue regarding K.M.-B. However, the court found that the best interest determination was proper. The determination was a discretionary matter, and the court found that the magistrate had not abused his discretion. Furthermore, the court found that R.C. 3109.12(A) was not unconstitutional as applied regarding the visitation determination for T.M. and applied the plain language of the statute. As to E.M., the juvenile court found that R.C. 3109.051(B)(1) is unconstitutional as applied because it treats E.M. differently than her siblings and violates the Equal Protection Clause of the Fourteenth Amendment. Appellants filed an appeal from this judgment.

## A. Nonparent Visitation Rights

{¶ 19} Grandparents have no constitutional right to association with their grandchildren. *Troxel v. Granville*, 530 U.S. 57, 65-69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 372, 696 N.E.2d 201 (1998); and *In re Schmidt*, 25 Ohio St.3d 331, 335, 496 N.E.2d 952 (1986). The establishment of a home and the rearing of children is a fundamental liberty interest

9.

protected by the Fourteenth Amendment to the United States Constitution. *Troxel* at 66 and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Parental autonomy entitles the parents the sole duty and right to the custody, care and nurture of their child. *Pierce v. Society of Sisters of the Holy Name of Jesus and Mary*, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Grandparents also have no common law legal rights of access to their grandchildren. *In re Whitaker*, 36 Ohio St.3d 213, 214, 522 N.E.2d 563 (1988), citing *In re Schmidt, supra*, at 336 (grandparents have no right to intervene in a custody proceeding). However, the state has an interest to protect the welfare of children and may infringe upon the parental autonomy liberty interest if the law is limited to serve a compelling state interest. *Troxel* at 65 and *Prince v. Massachusetts*, 321 U.S. 158, 166-169, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

{¶ 20} The relationships between grandparents and grandchildren, generally, are viewed as relationships beneficial to the welfare of children and, therefore, are relationships which must be statutorily protected if the bond is already formed or some event has prevented the formation of the bond. *Troxel* at 64 and Judith L. Shandling, *The Constitutional Constraints on Grandparents' Visitation Statutes*, 86 Colum.L.Rev. 118 (1986).

{¶ 21} The Ohio General Assembly enacted three statutes to give relatives reasonable companionship or visitation rights to maintain a relationship with an unmarried, minor child if requested and if such an award would be in the best interest of the child. R.C. 3109.11 (visitation when parent deceased); R.C. 3109.12(A) (visitation if

10.

a child is born to an unmarried woman); and R.C. 3109.051(B) (visitation arising out of "a divorce, dissolution of marriage, legal separation, annulment, or child support proceeding"). These statutes allow a relative visitation in these limited situations because the precipitating, disruptive event might give rise to a situation where a parent would deprive an estranged relative of a continued relationship with the child. *In re Gibson*, 61 Ohio St.3d 168, 169, 573 N.E.2d 1074 (1991), citing *In re Whitaker* at 215. Ohio's nonparent-visitation statutes have been declared constitutional, facially and as applied. *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 47 (regarding R.C. 3109.12(A) and 3109.51(D)), and *Spivey v. Keller*, 107 Ohio St.3d 100, 2005-Ohio-5973, 836 N.E.2d 1220 (regarding R.C. 3109.11 and 3109.051).

{¶ 22} The juvenile court is a court of special jurisdiction conferred upon it by statute and, therefore, cannot exceed its statutory authority. Section 4(B), Article IV, Ohio Constitution and *Gibson* at 172. To invoke jurisdiction of the juvenile court, an action must be brought pursuant to law. *Spoors v. Cowen*, 44 Ohio St. 497, 503, 9 N.E. 132 (1886).

### B. Visitation with E.M.

{¶ 23} In their first assignment of error, appellants argue that the juvenile court erred as a matter of law when it granted grandparent visitation regarding their daughter, E.M., who was born after her parent's marriage. Appellants argue that there is no statute which gives the juvenile court jurisdiction to make such an award. The grandmother

concedes that the trial court lacked jurisdiction to award nonparent visitation regarding E.M.

{¶ 24} In the case before us, the grandmother sought visitation pursuant to R.C. 3109.11 or 3109.12. Neither of these statues is applicable because E.M. was born to a married woman and neither parent is deceased. The juvenile court relied on R.C. 3109.051(B)(1), which grants a domestic relations court subject-matter jurisdiction to make a nonparent visitation order in a divorce, dissolution of marriage, legal separation, annulment, or child support proceeding. However, no such precipitating, disruptive event occurred and the juvenile court is not a domestic relations court.

{¶ 25} Instead, the juvenile court found that R.C. 3109.051(B)(1) is unconstitutional as applied to this case because it violates the Equal Protection Clause of the United States Constitution by treating a woman's child born within a marriage differently from her children born outside of marriage. We find that the juvenile court erred by applying R.C. 3109.051(B)(1) in this case because there was no termination of a marriage. Because we conclude that the juvenile court erred as a matter of law by awarding grandparent visitation regarding E.M., appellants' first assignment of error is found well-taken.

### C. Visitation with T.M.

{¶ 26} In their second assignment of error, appellants argue that the trial court erred when it determined that it had jurisdiction to award grandparent visitation regarding T.M., who was born several months before his parent's marriage.

12.

{¶ 27} R.C. 3109.12(A) governs the issue of the grandmother's right of visitation with T.M. That section provides that

> [i]f a child is born to an unmarried woman, the parents of the woman and any relative of the woman may file a complaint requesting the court of common pleas of the county in which the child resides to grant them reasonable companionship or visitation rights with the child.

R.C. 3109.12 (B) provides that

> [t]he marriage or remarriage of the mother or father of a child does not affect the authority of the court under this section to grant * * * the parents or relatives of the natural father or the parents or relatives of the mother of the child reasonable companionship or visitation rights with respect to the child.

{¶ 28} In the case before us, appellants objected to the grandmother's petition for visitation on the ground that the statute is unconstitutional as applied because it violates the Equal Protection Clause of the United States Constitution. They argue that the statute treats children born to unmarried parents who marry after the birth of their child differently from parents who are married at the time their child is born without any compelling reason to do so.

{¶ 29} The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Section 2, Article I of the Ohio

13.

Constitution provides that "[a]ll political power is inherent in the people. Government is instituted for their equal protection and benefit, * * *." These provisions provide the same protection. *Kinney v. Kaiser-Aluminum & Chem. Corp.*, 41 Ohio St.2d 120, 123, 322 N.E.2d 880 (1975). The Equal Protection Clause guarantees that laws will "operate equally upon persons who are identified in the same class." *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 20.

{¶ 30} A statute may be declared unconstitutional facially or "as applied to a class of persons or to an individual person." *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 36. Because statutes are presumed to be constitutional, *id*. at ¶ 36, the party challenging that a statute is unconstitutional as applied to a particular set of facts, "bears the burden of presenting clear and convincing evidence of a presently existing set of facts that make the statutes unconstitutional and void when applied to those facts." *Belden v. Union Cent. Life Ins. Co*., 143 Ohio St. 329, 55 N.E.2d 629 (1944), paragraph six of the syllabus.

{¶ 31} Two courts have held that through R.C. 3901.12, the "General Assembly has provided a means for extended family members of children born to unwed parents to involve themselves in the lives of such children, who do not benefit from a marital two-parent nuclear home environment." *Rugola-Dye v. Dye*, 5th Dist. Delaware No. 08 CAF 06 0038, 2009-Ohio-2471, ¶ 22. The statute also seeks to balance the rights of parents and relatives of a child born out of wedlock. *Nicoson v. Hacker*, 11th Dist. Lake No. 2000-L-213, 2001 WL 1602666, *3 (Dec. 14, 2001). *See also In re Whitaker*, 36 Ohio

14.

St.3d at 214-215, 522 N.E.2d 563 (the purpose behind R.C. 3109.11 and 3109.05(B) is to confer visitation rights upon nonparents because of a family disruption) and *Jacobs v. Jacobs*, 102 Ohio App.3d 568, 573, 657 N.E.2d 580 (9th Dist.1995), *abrogated on other grounds, Braatz v. Braatz*, 85 Ohio St.3d 40, 706 N.E.2d 1218 (1999) ("R.C. 3109.051 was enacted specifically to allow grandparents and other relatives to have visitation rights and generally 'to make other changes in the child visitation law.' Title, Am.Sub.H.B. No. 15, 143 Ohio Laws, Part II, 1964.").

{¶ 32} The justification for reasonable relative visitation rights is based on several lines of thought. One purpose is to preserve family connections where the father of the child is not present and the natural tension between in-laws could lead to the paternal family being cut off from the child. Annotation, *Validity of Grandparent Visitation Statutes*, 86 A.L.R.6th 1 (2013). Another purpose served by the statute is the protection of a maternal or paternal relative's relationship with a child of an unmarried couple which developed, because of the lack of a marriage, and the need for a relative to undertake parental-like duties to assist the mother. *Oliver v. Feldner*, 149 Ohio App.3d 114, 2002-Ohio-3209, 776 N.E.2d 499, ¶ 62 (7th Dist.) (regarding R.C. 3109.11). *See also* Bennett, Herbert, & McClellan, *TO GRANDMOTHER'S HOUSE WE GO: EXAMINING TROXEL, HARROLD, AND THE FUTURE OF THIRD-PARTY VISITATION*, 74 U.Cin.L.Rev. 1549 (2006). Furthermore, with respect to grandparent visitation, there is a desire to protect the unique nature of the grandparent/grandchild relationship. *Whitaker* at 216, citing *Mimkon v. Ford*, 66 N.J. 426, 437, 332 A.2d 199 (1975), and *Whitaker* at

15.

216, fn. 3, citing Zablotsky, *To Grandmother's House We Go: Grandparent Visitation after Stepparent Adoption*, 32 Wayne L.Rev. 1, 46 (1985).

{¶ 33} The grandmother first argues that no Equal Protection Clause issue can be raised because an unmarried parent and the married parent at the time of the child's birth are not similarly situated. She argues that cohabitating parents do not have the same rights as married parents and that the state has a legitimate interest in fostering marriage and this statute is one of many ways that the state treats married and unmarried people differently.

{¶ 34} We disagree. While the state does have the power to designate that certain rights arise out of the state of marriage, the state cannot control parental autonomy, a fundamental liberty interest, which arises out of the circumstance of becoming a parent, not marriage. It is only when parents are involved in a disruptive event that the state has authority to infringe upon the parental autonomy liberty interest.

{¶ 35} The grandmother also argues that the classification in this case does not infringe upon a fundamental liberty interest and that only a rational basis test is applicable. She argues that legitimate and illegitimate children are not a suspect class and have often been classified differently by the legislature. *Trimble v. Gordon*, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (concerning the constitutionality of a statute allowing illegitimate children to inherit by intestate succession only from their mothers, the court concluded that illegitimacy falls in the realm of less than strictest scrutiny).

16.

{¶ 36} We find, however, that the classification in this case is not based on the illegitimacy of the child, per se, but on whether the parents are involved in a disruptive event, i.e., bearing a child out of wedlock. Because a relative's statutory visitation right is an infringement upon the parent's fundamental liberty interest regarding the care, custody, and control of their children, we must apply a strict scrutiny standard of review. *Troxel*, 530 U.S. at 65, 120 S.Ct. 2054, 147 L.Ed.2d 49. If the statutory classification involves a suspect class or a fundamental right, the statute will be examined with "stricter scrutiny" to determine if "it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Therefore, R.C. 3109.12 must be supported by sufficiently important state interests (protecting the welfare of children born to a single woman household) and be closely tailored to effectuate only those interests.

{¶ 37} Where the parents marry after the child is born, several courts have held that the statute is unconstitutional as applied because it violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Rugola-Dye*, 5th Dist. Delaware No. 08 CAF 06 0038, 2009-Ohio-2471, ¶ 22 (court found the statute unconstitutional because it treats unmarried parents differently from married parents); *Nicoson*, 11th Dist. No. 2000-L-213, 2001 WL 1602666, *3 (court found the statute is not applicable to unmarried women who later marry the father of the child and the statute was unconstitutional as applied); and *In re A.Z.*, 4th Dist. Meigs No. 11CA3, 2011-Ohio-6739 (the lower court found the Equal Protection Clause was violated where the parents

17.

of a child married before the visitation action was initiated, but the court of appeals did not address the issue because appellant did not develop an assignment of error based on what was decided by the trial court).

{¶ 38} However, one court has held that R.C. 3109.12 applies even after marriage of the parents because the disruptive event is the fact that the parents were not married at the time of the child's birth and that fact can never be changed by a later marriage. *Stout v. Kline*, 5th Dist. Richland No. 96-CA-71, 1997 WL 219099, *2 (Mar. 28, 1997). Another court has held that a visitation award will not terminate even if the child is later adopted by a stepparent. *Moore v. Strassel*, 4th Dist. Pickaway No. 97 CA 32, 1998 WL 101354, *3 (Feb. 26, 1998).

{¶ 39} We find, in the case before us regarding T.M., the purposes behind the statute are not achieved by application of the statute. Here, the "unwed" mother was living with the father of the child at time of his birth and they married shortly thereafter. There was no absent father which caused a need for preservation of the paternal family. Furthermore, because the intervening relative is the maternal grandmother, there was no in-law issue. This was also not a case where a relative had to assume parental-like duties because the child was born out of wedlock. The circumstances of the child's birth did not give rise to a relationship between a relative and the child. While the grandmother had participated in the life of the grandchild since his birth, there was no evidence the grandmother was more involved in the child's life because of the circumstances of his birth.

18.

**{¶ 40}** We agree with appellants that in the factual situation before us, there was no significant disruptive event which justified the state's interference with the parents' autonomy interests. Although the child was born to an unwed mother, she cohabitated with the father of the child and the parents were married shortly after the child's birth. Furthermore, the grandmother did not assume any parental-like duties as a result of the marital status of the parents. Therefore, we find the statute is unconstitutional as applied to this case. Appellants' second assignment of error is well-taken.

### D. Visitation with K.M.-B.

**{¶ 41}** Because of our ruling that the statute cannot be applied to E.M. or T.M., we address the third and fourth assignments of error only with regard to K.M.-B., who was born out of wedlock to parents never married. In the third assignment of error, the mother argues that the manifest weight of the evidence does not support the trial court decision to award grandmother visitation and the juvenile court wrongly placed the burden of proof on the mother. In her fourth assignment of error, the mother argues that the trial court failed to give sufficient weight to the wishes of the fit parent. Both assignments of error are interrelated and will be addressed together.

**{¶ 42}** The mother concedes that R.C. 3109.12 is applicable to K.M.-B. However, she argues that the juvenile court did not give sufficient weight to the facts that 1) the court had granted the mother a civil protection order for 19 months to keep the grandmother from having contact with the grandchildren after her conviction for criminal damaging; 2) the mother did not want her children to be around the grandmother's

current husband, J.M., who had four DUI convictions; and 3) the grandmother would not abide by the mother's rules regarding visitations in the past. The mother also argues that the juvenile court placed the burden of proof upon her rather than the grandmother.

{¶ 43} A presumption exists that fit parents determine the best interests of their children. Therefore, absent allegations of unfitness, the court must give special weight to the wishes of the parent. R.C. 3109.051(D)(15); *Troxel*, 530 U.S. at 68, 120 S.Ct. 2054, 147 L.Ed.2d 49; *Harrold*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, at ¶ 12; and *In re E.T.B.*, 12th Dist. Clermont No. CA2014-07-051, 2015-Ohio-2991, ¶ 31. The burden of proving the best interest of the child warrants nonparent visitation rests with the nonparent. *In re N.C.W.*, 12th Dist. Butler No. CA2013-12-229, 2014-Ohio-3381, ¶ 25-26.

{¶ 44} The court must determine whether such grandparent visitation would be in the child's best interest after considering all relevant factors, including the factors listed in R.C. 3109.051(D). *In re K.C.*, 12th Dist. Butler No. CA2012-08-160, 2013-Ohio-1949, ¶ 8 (applying the factors of former R.C. 3109.051(B), now incorporated into R.C. 3109.051(D)). See Appendix A.

{¶ 45} First, we find the mother erroneously states that the appellate standard of review of the juvenile court's judgment is manifest weight. The juvenile court's decision regarding visitation rights is reviewed for an abuse of discretion. *In re Newsome*, 11th Dist. Ashtabula No. 2007-A-0030, 2008-Ohio-2132, ¶ 22, and *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989). Such deference is necessary because oftentimes

20.

the crucial evidence lies in the demeanor and attitude of the parties, which cannot be transcribed into the record. *See Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997). An abuse of discretion requires more than an error in judgment; the trial court's decision must be found to be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 46} The following evidence was submitted relating to the applicable factors: (1) The grandmother and her sister testified that the grandmother loves the children and has been involved with the family and with K.M.-B. a couple of times a week since the grandchild's birth in the customary ways of spending time with the grandchildren, babysitting the grandchildren, celebrating events or holidays with them, transporting the grandchildren, buying the grandchildren things, etc.. The grandmother lived with the family until she was charged with criminal damaging with intent to harm in 2012 after having an argument with the parents and was barred from contacting the family pursuant to a civil protection order for approximately 19 months. The record has since been expunged and sealed. (2) There is little evidence regarding the location of the residences, but it appears that the grandmother lives sufficiently near the grandchildren because she has attended their sporting events. (3) No evidence was submitted regarding the availability of K.M.-B. or her mother's schedule. (4) At the time of the hearing, the grandchild was nine years old. (5) No evidence was submitted regarding the grandchild's adjustment. (6) The grandchild indicated to her aunt and the court that she wanted to see her grandmother and spend time with her. However, the mother testified that she has

21.

shielded the child from all of the facts that supported her reason for limiting the child's contact with her grandmother. (7) No evidence was submitted regarding the health of the child. There was evidence the mother was concerned that the step-grandfather drinks and has had four DUI convictions and that she believed he was involved in drugs. Even though the mother had no actual proof of his drug involvement, her belief is a factor that must be given some weight. (8) No evidence was submitted regarding the time the grandchild would have to spend with siblings. (9) No evidence was submitted regarding the mental or physical health of the parties, except that the grandmother exhibited irrational behavior the night of the criminal damaging. (10) There was no evidence regarding the willingness of the parties to reschedule missed visitation time. (11) The grandmother and her sister both testified that the mother is a good mother. (12) There was no evidence that the grandmother had been convicted or pled guilty to any criminal offense regarding an abused or neglected child or an offense involving harm to a family or household victim. There was evidence, however, that the grandmother had committed criminal damaging with intent to harm at appellants' home while the children were present. (15) The mother testified that she does not want unsupervised visitation to occur because of the grandmother's prior criminal behavior, her inability to honor the mother's rules after the mother allowed visitation to occur after the civil protection order ended, the grandmother refused to cooperate with the mother in limiting her attendance at sporting events after an issue arose from her attending the same event as the paternal grandfather (the grandmother's former husband), and because the grandmother refused to

22.

avoid talking to the grandchildren about the step-grandfather and coming into contact with him because he drinks, has had four DUI convictions, and has had prior drug dealings. (16) No additional facts were presented.

{¶ 47} The magistrate found that the grandmother was involved in K.M.-B.'s life from birth, that she was a "significant and substantial part of the" child's life, the grandchild has a bonded relationship with the "maternal aunt" and some of the rest of her family, and the mother will not allow the grandchild to see her grandmother after a disagreement arose between the two, while the grandmother had a prior conviction for criminal damaging in 2012, the conviction had been expunged, and the grandmother is a school bus driver in good standing. The juvenile court adopted the decision of the magistrate without any additional findings.

{¶ 48} We find that the trial court abused its discretion in this case by determining it would be in K.M.-B.'s best interests to have visitation with her grandmother. While we do not find that the court shifted the burden of proof to the mother, we do find the court did not give adequate deference and weight to the mother's decision to limit the grandmother's visitation with K.M.-B. The juvenile court should have started with the presumption that the mother, as a fit parent, acted in the best interest of her child when choosing to deny the grandmother unsupervised visitation or visitation that met the mother's conditions. Instead, the juvenile court did not state that it gave the mother's wishes any consideration.

23.

{¶ 49} The juvenile court was required to consider all the relevant factors in R.C. 3109.051(D) and determine that the presumption the mother's decision was in the child's best interest had been refuted.  In this case, however, the decision of the juvenile court appears to have been based solely on the fact that the grandmother had been a part of K.M.-B.'s life and that the grandmother and the child missed their time together.  There was little evidence presented as to the remaining factors and the juvenile court did not address the factors in relation to the mother's reasons for limiting contact.  The juvenile court also never addressed the fact that there had been a prior civil protection order issued against the grandmother by another court.  Therefore, we find that the trial court abused its discretion by awarding the grandmother visitation with K.M.-B.

{¶ 50} Furthermore, in light of our holding that the court lacked jurisdiction to award visitation regarding the other two grandchildren, K.M.-B.'s best interest may no longer support the trial court's decision to award grandparent visitation only with K.M.-B.  We also question the amount of visitation time awarded, but we do not address this issue because the case must be remanded for reconsideration of this issue.

{¶ 51} Appellants' third assignment of error is found not well-taken.  Appellants' fourth assignment of error is well-taken.

{¶ 52} Having found that the trial court did commit error prejudicial to appellants, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is

reversed.  This case is remanded to the juvenile court for further proceedings consistent with this decision.  The grandmother is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Arlene Singer, J.

Stephen A. Yarbrough, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

**{¶ 53}** R.C. 3109.051(D) states:

(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;

(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent or companionship or visitation by the grandparent, relative, or other person who requested companionship or visitation, as to a specific parenting time

or visitation schedule, or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or

pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.